## THE W. H. BEAMAN.

### ALDRICH v. THE W. H. BEAMAN et al.

*(District Court, D. New Jersey. February 13, 1891.)*

1. COLLISION—BETWEEN STEAM-VESSELS—NEGLIGENCE—LOOKOUT.
   A collision in the East river between a ferry-boat and a canal-boat towed by a tug was caused by the failure of the tug to heed the signals of the ferry-boat. The tug had no lookout, and its pilot, looking at the ferry-boat from a window, mistook its course. *Held*, that the collision was caused by the negligence of the tug in having no lookout.

2. NAVIGABLE WATERS—STATE REGULATION.
   In the absence of any regulation on the subject by congress, the New York law providing that the East river between the Battery and Blackwell's island shall be navigated as nearly as possible in the middle of the stream is valid.

3. COLLISION—NEGLIGENCE—VIOLATION OF LAW.
   Where a collision occurs because one of the vessels is violating said law, such vessel is responsible for the accident.

In Admiralty.
*Hyland & Zabriskie*, for libelant.
*John Griffin*, for the Beaman.

GREEN, J. This action was brought to recover damages for the loss of the canal-boat Moscow, caused by a collision which occurred on the 29th of July, 1889, in the East river, New York. From the mass of contradictory evidence submitted, the following facts may be sifted with some degree of certainty: About 7 o'clock in the morning of that day, the canal-boat Moscow, being loaded with about 250 tons of coal, was taken in tow by the steam-tug W. H. Beaman at Wiehawken, N J., on the Hudson, to be taken to Port Morris, N. Y. The Moscow was securely fastened to the starboard side of the tug, her bow projecting several feet ahead of the stem of the tug. The course of the tug was down the North (Hudson) river to the Battery, thence, rounding the Battery, into and through the East river to her point of destination. Just beyond the Battery, at pier 2, East river, is the New York city terminus or slip of the Hamilton Ferry Company, operating a ferry from that point to Brooklyn. This slip is so narrowly constructed that there is room only for a single ferry-boat at any one time, and it is the usual and well-known custom for the incoming ferry-boat to await, out in the stream, the movements of the ferry-boat in the slip, generally delaying her own movements at or near Dimond reef, about 1,500 feet from the slip, until the outgoing ferry-boat had cast loose, and started on her trip to Brooklyn. Dimond reef is in the East river, and lies almost directly across the course between the New York city and the Brooklyn termini of the Hamilton ferry. Just about the time the Beaman, with the Moscow in tow, rounded from the North river into the East river, at the Battery, the Baltic, of the Hamilton Ferry Line, came nearly or entirely to a stand-still at or near Dimond reef, on her trip from Brooklyn to New York, awaiting the vacation of the ferry-slip by the ferry-boat then occupying it. The delay was on this occasion, however, very brief. The pilot of the Beaman plainly saw, not only the Baltic, whose accustomed course he must cross, but,

as well, the ferry-boat in the slip, and was proceeding slowly, under one bell, so that he might not hinder or interfere with her outward movement, which he anticipated would be, and which was, immediately made, in point of fact. The distance between the Baltic and the Beaman at this time was about 1,000 feet. As soon as the ferry-boat in the slip commenced moving out of it, the Baltic resumed her onward movement towards it, and her pilot, noticing the position of the Beaman, gave to her a signal of one whistle. This signal was due notice to the Beaman that the Baltic, in entering her ferry-slip, would take a course to the right or ahead of the tug. As the Beaman neither gave any responsive whistle, nor, indeed, to all appearance, heeded the signal of the Baltic in any wise, the pilot of the Baltic, when the two vessels were about 500 or 600 feet apart, gave another signal of one whistle, and then ported his wheel, to make the necessary swing into the ferry-slip. The second signal was unnoticed or wholly disregarded by the Beaman, and, as she continued on her course, the pilot of the Baltic, perceiving that a collision was thereby rendered imminent, signaled his engineer to "stop and back strong." This order was promptly obeyed, but the headway of the ferry-boat could not be immediately overcome, and the collision occurred. The Moscow received a slight blow from the Baltic, causing a leakage, from the effects of which she speedily sank. There was no lookout stationed upon the Beaman, nor upon the Moscow.

Upon these facts, I am constrained to find the Beaman in fault, and responsible for the collision and its results—

*First.* Because the Beaman grossly violated the rules of navigation in failing to have a proper, or, in fact, any, person stationed upon her as a lookout. To navigate with a steam-tug or any other vessel the North or East rivers in the immediate vicinity of New York city, where vessels of all descriptions are passing and repassing, crossing and recrossing, in constant procession, and in great numbers, without the presence of a competent and watchful person on board, properly stationed as a lookout, and so advantageously posted that he may gain the earliest view of the surrounding and approaching vessels which crowd to the utmost these water thoroughfares, is simply an act of gross culpable negligence; and those guilty of risking lives and property by such careless inattention to or disregard of well-known rules should be sternly dealt with. I am aware that the absence of a lookout has sometimes been condoned when it has clearly appeared that the collision would not have been prevented by his presence; but this is not such a case. On the contrary, as the facts appear to me, the absence of the lookout upon the Beaman had a direct relation to the cause of this collision. Her pilot practically confesses that he neither heard nor answered nor gave heed to the signals of the Baltic. Had he done so, this collision would not have occurred. He seeks to palliate this obtuseness by stating that he thought, from a glance which he gave to the Baltic out of the starboard window of his pilot-house, that she was taking a course which would carry her astern of his tug, and therefore, as counsel ingeniously argued, if he *quasi* unconsciously heard the signals, he must have imagined they were intended for some other than his vessel, astern of his tug, and hence was justified in

his inattention. The difficulty with such justification is that it does not justify. Inattention to plain duty is not excusable. The pilot had no right to imagine anything about the course or the movements of the Baltic. As he was the only person pretending to act as a lookout on board the tug, it was his duty to keep a constant and sharp-watch upon the movements of the ferry-boat, whose slip, to which he knew she was bound, was just ahead of him. The vessels were coming rapidly into close quarters. There were other vessels in the immediate vicinity. To avoid collision, constant, careful, unremitting watching was absolutely necessary. Glances out of starboard windows of a pilot-house were wholly inadequate. Facts, and not imaginary conclusions, were the only safe criterions for action in the emergency, and absolute occurrences could only be noted by the most diligent observation. That one engaged in directing the course of the tug through this maze could not, of necessity, give such diligent observation to the movement of other vessels is too obvious to need argument. Hence arises the necessity for the strict observance of the rule requiring a lookout; one whose sole duty it would be to be wary and watchful, whose attention would be constant, and not subject to distraction by the pressure of other duties, such as are incumbent upon a pilot. Hence the negligence of the Beaman. And it may well be insisted further, if there had been a proper person on the Beaman as lookout, doubtless he would have heard and noticed the signals of the Baltic; and, having his attention especially attracted thereby to her, could and would have given timely notice to his pilot of her whereabouts and of her movements, and thus have placed the pilot in possession of facts, acting upon the knowledge of which he could rightfully and successfully have governed and directed the course of the tug, so as to avoid the slightest danger of collision. Certainly it is a justifiable conclusion to adjudge the absence of a lookout on the Beaman to be the primary cause of this collision. *Haney* v. *Steam Packet Co.*, 23 How. 293; *The Munhasset*, 34 Fed. Rep. 408.

*Secondly.* The Beaman was in fault in another particular. She was proceeding on her course through the East river altogether too close to the line of the New York city shore. The law of New York relating to the navigation of the East river between the Battery and Blackwell's island provides that it shall be navigated as near as possible in the center of the river; and the master who shall be guilty of violating this provision shall be deemed to be guilty of a misdemeanor. The river at the point in question is about 4,000 feet wide. The Beaman was on a course only about 300 feet from the shore line. Her position was fully 1,500 feet out of her proper course, and the result of her failure to comply with the requirements of the statute, perfectly well known to her pilot, was that she would, and, as the facts show, did in this case, interfere with, impede, and hinder or disturb, the movements of every ferry-boat whose slip she might pass. Had the Beaman obeyed the law, instead of continuing upon the course which she held so close to the shore, and, in consequence, placing herself ahead and in front of the Baltic, she would have eased away to the starboard as soon as she sighted the Baltic, and, passing astern of her, would have sought and found

safety and a lawful course in the middle of the river.    Her failure to do this must be held to be a fault contributing to the collision.

It was urged upon the argument of this cause that the statute in question is inoperative and void; that the state of New York has not the power to make such a regulation of navigation; that the federal government has assumed jurisdiction of these waters; and that congress has the power to legislate in relation thereto, to the exclusion of the legislature of the state of New York.    But I do not think this proposition tenable, as broadly as it is stated.    The general right to control and regulate the public use of navigable waters is unquestionably in the state; but there are certain restrictions upon this right growing out of the power of congress over commerce.    Congress is empowered to regulate both foreign and interstate commerce, and, whenever navigable waters form a highway over which commerce, foreign or interstate, is conducted, they must fall under the legislative control of the federal government.    The fact that certain waters are navigable, and are used for foreign or interstate commerce, does not exclude legislative regulation by a state, if, in fact, congress has not legislated in regard to them; or, if such legislation has been had by congress, if the legislation of the state does not come in conflict with the congressional legislation, and is not antagonistic to the rights conferred or granted thereby, its validity is unquestionable.    Many enactments of state legislatures relating to navigable waters have been upheld and sustained as clearly within the limits of the legislative power of states by the supreme court of the United States.    It is not necessary to cite instances, and I do not think it has ever been doubted that a state has the same power to regulate, *inter alia*, the speed and general conduct of ships and vessels navigating its water highways that it has to regulate the speed and general conduct of vehicles upon its ordinary highways; subject, of course to the restriction that regulations emanating from such a source must not in any wise contravene or conflict with the regulations which congress may have enacted relating to the conduct of foreign or interstate commerce.    This statute of New York governing the conduct of vessels while navigating the East river does not, as far as I am informed, conflict with or violate any legislation of congress relating to commerce. It is clearly within the well-defined limits of the police power of the state, and is as valid and obligatory in its nature as it is beneficial in its character.

Upon the argument of this case counsel for the Beaman insisted that the Baltic was culpably negligent in her maneuvers on this occasion, and should be held responsible for the collision.    The Baltic has not been brought before this court.    She has never been within its jurisdiction,[1] so far as it appears.    There has been no seizure by the marshal. No appearance to the libel has been entered, so far as she is concerned. No one presented himself as counsel on her behalf, either at the taking of the testimony, or at the hearing before the court.    Under these circumstances, I do not feel at liberty to make any adjudication as to her.

[1] See The Baltic, (S. D. N. Y.) 41 Fed. Rep. 603.